# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | | |
|---|---|---|
| AMY J. MCFADDEN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:08-CV-0467-B |
| | § | |
| SEAGOVILLE STATE BANK, a/k/a | § | |
| HOMEBANK, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM ORDER

In this action Plaintiff Amy J. McFadden claims that her former employer, Defendant Seagoville State Bank, a/k/a Homebank (the "Bank"), interfered with rights to which she is entitled under the Family and Medical Leave Act ("FMLA"), and unlawfully retaliated against her for exercising her right to take medical leave under the FMLA. The Bank maintains that McFadden cannot establish an FMLA violation as a matter of law because the uncontradicted evidence shows that 1) the Bank is not a "covered employer" and McFadden is not an "eligible employee" under the FMLA; and 2) McFadden has failed to bring forth evidence to establish a *prima facie* case or establish a genuine issue for trial on her interference and retaliation claims. The Bank has moved for summary judgment (doc. 17) on these bases. The Bank has also filed an Objection to and Motion to Strike McFadden's Summary Judgment Evidence (doc. 19). For the reasons explained below, the Court **GRANTS** the Bank's Objections and Motion to Strike (doc. 19). The Motion for Summary Judgment (doc. 17) is **GRANTED** in part, and **DENIED** in part.

## I. Background[1]

At the time she took leave, McFadden was employed by the Bank in the Credit Department of the Seagoville branch. She began working for the Bank on April 1, 1997 as a teller. She later went on to take a position in the Credit Department of the Seagoville branch. On September 12, 2006, McFadden informed the Bank that she was pregnant. On April 10, 2007, McFadden's doctor ordered her to go on bed rest due to high blood pressure. McFadden called her supervisor, Melissa Bower, to inform her that she would not be back at work. On April 11, 2007, Melissa Bower picked up McFadden's doctor's note from McFadden's home and delivered it to Kelly Jones, Vice President of Human Resources. From April 10, 2007 to May 15, 2007, McFadden was on leave, using three weeks vacation time and one week sick time.

On June 1, 2007, McFadden had not yet returned to work. McFadden called Kelly Jones and informed her she wanted to take FMLA leave. According to Jones's affidavit, she told McFadden that she was "entitled to take leave without pay for an additional period due to the birth of her child" and instructed McFadden to make her request in writing. McFadden does not dispute that Jones also informed her that "there was no assurance that she would be reinstated to the same position regardless of how much additional leave she took." On July 17, 2007, after receiving the news from her doctor that she would be unable to perform her job duties through August 6, 2007, McFadden gave written notice to the Bank that she wanted to take FMLA leave through August 6, 2007.

According to McFadden's deposition testimony, the Credit Department at the Seagoville branch where McFadden worked was typically staffed by two people, but could be run by just one

---

[1] The Court takes these facts from the undisputed facts presented by the parties in their briefing on the Motion for Summary Judgment and assumes these facts true for purposes of its legal analysis.

person when necessary. McFadden's extended leave left the department understaffed. The Bank hired Ashley Upchurch to perform the duties McFadden had previously performed in the Credit Department and she was permanently assigned to the position in July 2007. At the time of McFadden's leave, the Bank had three locations and had employed no more than fifty employees on its payroll within a seventy-mile radius of the Seagoville branch during the year and previous year in which McFadden took leave.

On August 6, 2007, McFadden returned to work at the Seagoville branch expecting to go back to her previous position in the Credit Department. The Bank informed her that the Credit Department position was filled by Ashley Upchurch and there were no other open positions at the Seagoville branch. McFadden does not dispute there were no open positions at the Seagoville branch when she returned from leave. McFadden was offered a teller position at the Buckner branch in Dallas. The Buckner branch is twenty miles away from the Seagoville branch where McFadden had been employed. The Seagoville branch is seven miles away from McFadden's hometown, but the Buckner branch is twenty-five miles away from McFadden's hometown.

The teller position McFadden was offered had the same pay and benefits as her former position. McFadden was told she would receive the schedule from the teller supervisor at the Buckner branch by fax. She was not told what hours she would be working as a teller, but McFadden knew from her years of working at the Bank that the teller hours differed from those of her former position. McFadden asked Kelly Jones if the teller position at the Buckner branch would be a temporary assignment and was told it would be permanent.

On that first day back at work, after the conversation regarding new position as a teller position at the Buckner branch, McFadden began training as a teller to become familiar with new

procedures. That evening, McFadden decided to resign from the Bank. McFadden did not tell anyone at the Bank that she did not want to work at the Buckner location, that she objected to a change in her hours, or that she had any objection to the position she was being offered. McFadden admits in her deposition testimony that it is her "preference" not to work as a teller at the Buckner location. On August 7, 2007, McFadden turned in a two-weeks' notice, stating that she had "no interest in being a Buckner teller after ten years with Homebank Seagoville." McFadden asserts this was a "forced resignation" because of the circumstances created by the Bank.

McFadden initiated this lawsuit on March 17, 2008, alleging that the Bank interfered with her right under the FMLA to return from leave to her former position or an equivalent position, and that in retaliation for making a request for leave under the FMLA, it caused her to resign. On September 3, 2008, the Bank filed a Motion for Summary Judgment seeking the dismissal of McFadden's claims (doc. 13). McFadden filed her Response, supported by an appendix containing several exhibits. The Bank filed Objections and a Motion to Strike Plaintiff's Summary Judgment Evidence (doc. 19). Both motions are presently ripe for adjudication.

## II. Motion to Strike McFadden's Summary Judgment Evidence

The Court must first rule on the Bank's Objections to and Motion to Strike Plaintiff's Summary Judgment Evidence (doc. 19) before considering the Motion for Summary Judgment. The Bank complains of two pieces of evidence provided by McFadden in support of her summary judgment response. McFadden did not respond to the Bank's Objections and Motion to Strike.

First, the Bank objects to a supporting affidavit which was filed separately from the appendix supporting the motion. The Bank argues that without leave of Court, McFadden cannot introduce evidence outside of the appendix she had already filed. The Northern District of Texas Local Rule

56.7 states that "except for the motions, responses, replies, brief, and appendixes required by these rules, a party may not without the permission of the presiding judge, file supplemental pleadings, briefs, authorities, or evidence." N.D. Tex. Rule 56.7. The Court notes that the affidavit is already included in the properly filed appendix in support of McFadden's response. However, the separately filed affidavit was filed without permission of the Court. Therefore, the affidavit of Amy J. McFadden (doc. 17) that was filed separately is not properly before the Court. The **OBJECTION** (doc. 19) as to the separate affidavit filed as document 17 is **SUSTAINED**.

Second, the Bank complains of the Texas Workforce Commission records included in McFadden's appendix in support of her response to the motion for summary judgment as appendix pages App. 048-092, contained entirely in Exhibit 2 of document 16. These documents were generated in relation to McFadden's claim for unemployment benefits. The Bank cites to the Texas Labor Code in support of its argument that these documents are inadmissible in this litigation. The Labor Code provides that:

> A finding of fact, conclusion of law, judgment, or final order made under this subtitle is not binding and may not be used as evidence in an action or proceeding, other than an action or proceeding brought under this subtitle, even if the action or proceeding, even if the action or proceeding is between the same or related parties or involves the same facts.

Tex. Lab. Code § 213.007.

The Fifth Circuit, in dicta and relying on an earlier version of this statute, found two persuasive reasons for a court to refuse to give preclusive effect to the findings of the Texas Employment Commission, the precursor to the Texas Workforce Commission. *Atkinson v. Denton Publishing Co.*, 84 F.3d 144, 150 (5th Cir. 1996) (discussing Tex. Rev. Stat. Ann. Art. 5221b-9(r) (now codified as Tex. Lab. Code § 213.007)). There, the circuit court reasoned that the Texas

legislature has denied preclusive effect of certain Commission determinations because the adjudication process of the Commission "is geared to the disposal of a large number of cases in an expeditious manner." *Id.* at 150–51 (citing REPORT BY THE TEXAS HOUSE COMM. ON LABOR AND EMPLOYMENT RELATIONS, H.B. 813 (Mar. 26, 1991)). Further, the court recognized that "[t]he mere possibility that collateral estoppel will be applied has the potential for bogging down the appeals process under the Texas Unemployment Compensation Act by protracted litigation where further litigation is contemplated in other forums involving the same facts and parties." *Id.* at 151. These reasons justify the legislature's dictate that the Commission's administrative decisions are not admissible in matters of collateral litigation. *Id.* Therefore, the records and findings of the Texas Workforce Commission in this case are inadmissible. *See* TEX. LAB. CODE § 213.007. The **OBJECTION** (doc. 19) as to the Texas Workforce Commission documents contained in McFadden's Appendix (doc. 16) is **SUSTAINED**.

Accordingly, the Motion to Strike Plaintiff's Summary Judgment Evidence (doc. 19) is **GRANTED**. The affidavit filed as document 17 is **STRICKEN**. This does not apply to the affidavit contained in the appendix itself. The Texas Workforce Commission Records contained in pages App. 048-092 of the Appendix to Plaintiff's Response to Defendant's Motion for Summary Judgment, consisting of the entirety of **Exhibit 2 to document 16**, are **STRICKEN**. With the Banks's objections and motion to strike resolved, the Court now turns to the Motion for Summary Judgment. In accordance with the rulings above, the Court will not consider the stricken documents in determining the Motion for Summary Judgment.

### III. Summary Judgment Legal Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate

when the pleadings and record evidence show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075(5th Cir. 1994). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Only disputes about material facts will preclude the granting of summary judgment. *Id.*

The burden is on the summary judgment movant to prove that no genuine issue of material fact exists. *Latimer v. Smithkline & French Lab.*, 919 F.2d 301, 303 (5th Cir. 1990). If the non-movant bears the burden of proof at trial, the summary judgment movant need not support its motion with evidence negating the non-movant's case. Rather, the movant may satisfy its burden by pointing to the absence of evidence to support the non-movant's case. *Id.*; *Little*, 37 F.3d at 1075.

Once the movant has met its burden, the non-movant must show that summary judgment is not appropriate. *Little*, 37 F.3d at 1075 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). "This burden is not satisfied with 'some metaphysical doubt as to material facts,' . . . by 'conclusory allegations,' . . . by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The non-moving party must "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita*, 475 U.S. at 587 (emphasis in original) (quoting FED. R. CIV. P. 56(e)). To determine whether a genuine issue exists for trial, the court must view all of the evidence in the light most favorable to the non-movant, and the non-moving party must show that the evidence is sufficient such that a reasonable jury could return a verdict for the non-movant. *Munoz v. Orr*, 200 F.3d 291, 302 (5th Cir. 2000); *Anderson*, 477 U.S. at 248–49.

## IV.  Family Medical Leave Act

The FMLA allows eligible employees working for covered employers to take a reasonable leave of absence for certain enumerated reasons, including medical reasons, without fear of losing their jobs as a result.  29 U.S.C. § 2601(b); *Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 763 (5th Cir. 2001).  The Fifth Circuit has explained that the statute contains both prescriptive and proscriptive components.  *See Nero v. Indus. Molding Corp.*, 167 F.3d 921, 927 (5th Cir. 1999).  The prescriptive (or entitlement) provision creates a series of substantive rights.  *Id.*  For example, the FMLA mandates that covered employers provide eligible employees up to 12 weeks of unpaid leave if the employee has "a serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D); *Hunt*, 277 F.3d at 763.  Upon returning from leave under the Act, an employee is also entitled to be restored to his or her former position or to an equivalent position.  29 U.S.C. § 2614(a)(1); *Nero*, 167 F.3d at 927.  The proscriptive aspect of the FMLA protects employees from retaliation or discrimination for exercising their rights under the statute.  *Nero*, 167 F.3d at 927.

### A.    Applicability of the FMLA

In its first argument in the Motion for Summary Judgment, the Bank asserts that the FMLA does not apply because the Bank is not a "covered employer" and McFadden is not an "eligible employee" under the FMLA.  The FMLA applies only to "covered employers" and "eligible employees."  "An employer covered by the FMLA is any person engaged in commerce or in any industry or activity affecting commerce, who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year."  29 C.F.R. § 825.104(a).  The FMLA excludes from the term "eligible employee" "any employee of an employer

who is employed at a worksite at which such employer employs less than 50 employees if the total number of employees employed by that employer within 75 miles of that worksite is less than 50." 29 U.S.C. § 2611(2)(B)(ii). The Bank presents evidence that at all applicable times, it had fewer than fifty employees on its payroll within the seventy-five mile radius of the worksite where McFadden was employed. McFadden does not dispute these facts. Thus, the Bank has made a *prima facie* showing that it is not a covered employer and McFadden is not an "eligible employee" under the FMLA. If the analysis were to stop here, McFadden's claims under the FMLA would clearly fail.

However, McFadden argues the doctrine of equitable estoppel applies here to prevent the Bank from asserting she is ineligible for FMLA protection. McFadden cites to a Fifth Circuit case holding that equitable estoppel can bar a defendant from claiming a "non-eligible" employee is not eligible for relief under the FMLA, under certain circumstances. *Minard v. ITC Deltacom Comm's, Inc.*, 447 F.3d 352, 358–59 (5th Cir. 2006). Under federal law, the doctrine of equitable estoppel is "invoked to avoid injustice in particular cases." *Id.* at 358. To invoke the doctrine of equitable estoppel, the plaintiff must prove that the party to be estopped:

> (1) made a material misrepresentation or concealment;
>
> (2) with actual or constructive knowledge of the true facts;
>
> (3) with the intent that the misrepresentation or concealment be acted upon;
>
> (4) by a party without knowledge or means of knowledge of the true facts;
>
> (5) who detrimentally relies or acts on the misrepresentation or concealment.

*Garcia v. Blueberry Sales, L.P.*, 2006 WL 506093, at *4–*5 (W.D. Tex. Feb. 23, 2006) (citing *Matter of Christopher*, 28 F.3d 512, 520 (5th Cir. 1994)); *see also Minard*, 447 F.3d at 358. The Fifth Circuit

has explained that "the party claiming the estoppel must have relied on its adversary's conduct in such a manner as to change his position for the worse." *Minard*, 447 F.3d at 358 (internal quotations omitted). Further, that "reliance must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading." *Id.* The doctrine does not require any intent to deceive by the party to be estopped. *Id.* at 358–59. In fact, estoppel may be appropriate "even where the one making the representation believes that his statement is true and, moreover, it is immaterial whether the person making the representation exercised due care in making the statement." *Id.* at 359.

In *Minard*, the Fifth Circuit recognized the applicability of the doctrine of equitable estoppel in circumstances where an employer makes a representation regarding an employee's eligibility under the FMLA. *See id.* The Fifth Circuit held that:

> an employer who without intent to deceive makes a definite but erroneous representation to his employee that she is an "eligible employee" and entitled to leave under FMLA, and has reason to believe that the employee will rely upon it, may be stopped to assert a defense of non-coverage, if the employee reasonably relies on the representation and takes action thereon to her detriment.

*Id.* (citing several cases recognizing the applicability of equitable estoppel to estop an employer's claim that employee is ineligible under the FMLA); *see also Morgan v. Neiman-Marcus Group, Inc./Neiman-Marcus Direct*, 2005 WL 3500314, *5 (N.D. Tex. Dec. 20, 2005). Similarly, the Seventh Circuit has recognized, in dicta, that "an employer who by his silence misled an employee concerning the employee's entitlement to family leave might, if the employee reasonably relied and was harmed as a result, be estopped to plead the defense of ineligibility to the employee's claim of entitlement to family leave." *Dormeyer v. Comerica Bank-Illinois*, 223 F.3d 579, 582 (7th Cir. 2000). Therefore, if a "Plaintiff should present *prima facie* evidence of the elements necessary for equitable estoppel, it

would be a question of fact as to whether Defendant would be estopped from contesting Plaintiff's FMLA eligibility." *Garcia*, 2006 WL 506093, at *5.

Although it is undisputed that the Bank did not meet the threshold number of employees to make McFadden eligible for leave under the FMLA, McFadden has presented *prima facie* evidence favoring application of the equitable estoppel doctrine. McFadden has presented evidence that she requested "FMLA leave," using that exact phrase, and was told by Human Resources that she could take it. The Bank's evidence confirms that McFadden used the term "FMLA leave" in her conversations with Kelly Jones in Human Resources and in the written request for leave. Notably, the Bank's evidence demonstrates that it documented McFadden's leave request internally with a memo entitled "Amy McFadden's FMLA file." The memo written by Kelly Jones in Human Resources, dated June 1, 2007, reads:

> Amy McFadden inquired about FMLA (Federal Medical Leave Act) and proposed that she may take her 12 weeks of FMLA. Her FMLA leave would start May 15, 2007 through August 6, 2007. Amy inquired what she needed to do and I instructed her to notify me in writing to notify me of FMLA. I am documenting this as notification of FMLA.

McFadden also presents evidence in her affidavit that she relied on the representation that the leave was "FMLA leave" and, had she known it was not approved leave under the FMLA, she would have made arrangements to return to work earlier. She also presents evidence that she "really didn't know" anything about the requirements for FMLA leave, other than that two friends who were employed elsewhere told her to ask about it and that Kelly Jones in Human Resources said McFadden was entitled to take the leave she had requested.

The Bank argues the term "FMLA leave" was used internally for the sake of "administrative convenience," and because the term was originally used by McFadden herself, but that it does not

mean the leave granted to McFadden was actually FMLA leave. It argues that while the Bank does have a policy allowing unpaid maternity leave for female employees, the Bank has never had a policy or followed a practice that employees are entitled to leave under the FMLA.

However, even if the Bank never affirmatively told McFadden she had been approved for "FMLA leave" in those terms, the Bank, by its silence, left McFadden with the impression that the leave was approved FMLA leave. *See Dormeyer*, 223 F.3d at 582. McFadden's evidence is sufficient to create a genuine issue for trial on whether the Bank is estopped from arguing it is not a "covered employer" or McFadden is not an "eligible employee" under the FMLA. *See Garcia*, 2006 WL 506093, at *5. These fact issues preclude a summary judgment in favor of the Bank based on the inapplicability of the FMLA. Now, the Court turns to the arguments regarding McFadden's substantive claims under the FMLA.

**B.      Prescriptive Claim: Interference**

In her complaint, McFadden asserts that the Bank interfered with rights to which she is entitled under the FMLA by failing to return her to her former position or an equivalent position when she returned from leave. The Bank asserts that summary judgment in its favor is appropriate on McFadden's prescriptive claim because it provided everything to which McFadden would be entitled under the FMLA. Although it was unable to reinstate McFadden to her previous position, the Bank argues McFadden was reinstated to an equivalent position after her return from leave. In response, McFadden offers reasons why the teller position she was offered was not an equivalent position.

To make out prescriptive claim based on an entitlement under the FMLA, a plaintiff must establish that:

> 1) he is an eligible employee under the Act;
>
> 2) the defendant-employer is subject to the Act's requirements;
>
> 3) the plaintiff was entitled to leave under the Act;
>
> 4) the plaintiff gave proper notice to the defendant of his intention to take FMLA leave; and
>
> 5) the defendant denied plaintiff the benefits to which he was entitled under the Act.

*See McCown v. U.S. Personnel, Inc.*, 2006 WL 2623938, at *9 (N.D. Tex. Sept. 11, 2006); *Morgan*, 2005 WL 3500314, at *4 .

"When an eligible employee returns from leave taken under the FMLA, the employer must restore the employee to the same position or to 'an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.'" *Hunt*, 277 F.3d at 763 (quoting 29 U.S.C. § 2614(a)(1)). The Department of Labor's regulations define an "equivalent position" as one that is "virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, prerequisites and status. 29 C.F.R. § 825.215(a). In addition, the position must have "the same or substantially similar duties and responsibilities which must entail substantially equal effort, skill and authority." *Id.* The regulations state that the "employee must be reinstated to the same or a geographically proximate worksite (i.e., one that does not involve a significant increase in commuting time or distance) from where the employee had previously been employed." 29 C.F.R. § 825.215(e)(1). The regulations also provide that "an employee is ordinarily entitled to return to the same shift or an equivalent work schedule." 29 C.F.R. § 825.215(e)(2).

Furthermore, "[t]he requirement that an employee be restored to the same or equivalent job with the same or equivalent pay, benefits, and terms and conditions of employment does not extend to de minimis or intangible, unmeasurable aspects of the job." 29 C.F.R. § 825.215(f).

The Bank's Motion for Summary Judgment specifically focuses on McFadden's ability to show she was denied the benefits to which she was entitled under the FMLA. There is no dispute that the Bank in fact granted McFadden's request for leave, that McFadden received all the leave she requested, and that McFadden never made a request for leave that was denied. Rather, McFadden argues the Bank failed to restore her to her former position or an equivalent position upon her return to work. On this element the Bank argues that no genuine issue of material fact exists because the evidence shows the positions were equivalent.

The Court notes that as the movant, the Bank must first show that there is no genuine issue of material fact for trial before the burden would shift to McFadden to produce controverting evidence to establish her *prima facie* case. The Bank fails to meet its initial burden on this claim because the evidence it provides demonstrates the existence of a question of fact on whether McFadden was in fact restored to an equivalent position, as would be her right under the FMLA. In support of its Motion, the Bank provides evidence that the Court finds raises a fact question on whether the Buckner location is a "geographically proximate worksite." *See* 29 C.F.R. § 825.215(e)(1). The Bank's evidence shows that McFadden's job at the Seagoville location required a seven mile commute one way, which takes ten minutes to drive. The Buckner branch is twenty-five miles from McFadden's hometown, a commute of thirty minutes each way. The Bank states in its Motion that McFadden "would have been required to drive approximately 18 additional miles to her position in the Buckner branch, which would require an additional 20 minutes of driving time

each way."

The Bank goes on to assert that commuting is a common practice for Bank employees and another employee commutes from McFadden's hometown to the Buckner branch on a daily basis. It also asserts that because of its small size, the Bank sometimes shifts its employees between the different branches to meet its staffing needs. The Bank argues that an "additional 18 mile drive to work under these circumstances can hardly be considered a significant alteration of her position." To the contrary, the Court finds these facts hit right at the heart of the question of whether McFadden was assigned to a "geographically proximate worksite" as required by the FMLA and clearly articulated in the Department of Labor regulations. *See* 29 C.F.R. § 825.215(e)(1). The Court finds that there is a genuine issue for trial on whether tripling the employee's commuting time and more than tripling the distance to the worksite is a "significant increase in commuting time or distance." *See* 29 C.F.R. § 825.215(e)(1). Therefore, the Bank has failed to meet its initial burden to prove there is no genuine issue of material fact. *See Latimer*, 919 F.3d at 303.

Even if the Bank had met its initial burden to prove there is no genuine issue of material fact, McFadden has brought forth evidence to create a fact issue on other factors supporting her argument that the teller position was not an equivalent position. *See Matsushita*, 475 U.S. at 587. The Court initially notes there are several factors that McFadden does not challenge. McFadden does not dispute that her pay and benefits remained the same. She does not argue that the positions entailed different levels of effort, skill, or authority. Neither does McFadden assert that a transfer to a teller position was a "demotion" or was perceived as an undesirable job. She stated a preference for having a different job than the same position she had held eight years previously. She had "no interest" in being a teller at the Buckner location. However, she does assert other facts that indicate the teller

position is not an equivalent position.

First, McFadden argues the teller position is not an equivalent position because the job duties were different from the duties of her position in the Credit Department. She does not provide any official description of the responsibilities and duties of each position, but relies on her own description of the jobs. She describes her duties and responsibilities when she was a teller eight years previously, "Well, your customers come in and you do the transaction with cash. You help the customers with problems they have. You give balances and stuff like that." Yet McFadden does admit that the job duties of a teller have changed since she held the position. In contrast, McFadden describes the duties of the position in the Credit Departments as follows:

> Well, we would run credit applications. When customers came in requesting a loan, we would run the credit and then take it out to the loan secretary or other officer, and they would decide whether they wanted to do the loan. And then they would . . . the loan secretaries would type it all up, they would bring it back to us, and we would load it on the system. And I did balancing . . . different general ledger balancing and stuff like that in the mornings. We did . . . we filed loans whenever they did their folders or that . . . all that stuff, we filed all that. We did the insurance. Like when they had auto loans and stuff like that, we would put the insurance on the computer, file all that.

The Bank argues that while the job duties McFadden describes are not identical, the statute does not require that the duties of the new position be identical to those of the former position. The statute requires "substantially similar duties and responsibilities." *See* 29 C.F.R. § 825.215(a). The Bank asserts the positions require substantially similar duties and responsibilities because both positions are customer service positions in which the employee handles customer inquiries and attends to their banking needs. Furthermore, the Bank argues the comparison of the job descriptions is based only on McFadden's description of the teller position she had held several years prior, not

the new teller position to which she had been assigned. In the Bank's view, McFadden had not yet been made fully aware of the duties and responsibilities of her new position because she had resigned so abruptly.

Despite the Bank's characterization of both positions at a generalized level as customer service positions, McFadden's description of the duties of the different positions, based on her years of experience working at the Bank, presents a fact issue for the jury to resolve. Based on the above evidence, the Court finds that there is a factual dispute on whether the teller position had the same or substantially similar duties and responsibilities as McFadden's former position. *See* 29 C.F.R. § 825.215(a).

Further fact issues arise in McFadden's argument that the teller position is not an equivalent position because the hours were different. McFadden asserts she "knew the hours would be changed if she took the job as teller because she had worked at the bank for ten years and knew the teller's schedules were different than the schedule [McFadden] was working." When she had worked as a teller previously, McFadden's hours were 7:00 a.m. to 3:30 p.m. on Monday through Thursday, and 8:00 a.m. to 6:00 p.m. on Friday. She also was required to work two Saturdays a month. In the Credit Department, McFadden worked 8:00 a.m. to 4:00 p.m. Monday through Friday.

McFadden admits that she had not yet received any information from the Bank regarding what her schedule at the Buckner location would be at the time she resigned. She was told she would receive the information, but resigned before it was received. From her knowledge of the typical hours worked at the Bank, it is clear that the change in hours would not be as significant as a "shift change" from a day shift to night shift. *See* 29 C.F.R. § 825.215(e)(2); *cf. Hunt*, 277 F.3d at 766 (holding that a fact issue existed on whether shift change from day to night, even with identical

duties and rate of pay, is an equivalent position). However, whether the differences in the teller schedule McFadden describes from her years of experience working for the Bank is an "equivalent work schedule" to the schedule she had worked in the Credit Department is a genuine issue for the jury. *See* 29 C.F.R. § 825.215(e)(2).

Accordingly, the Court finds that the Bank has failed to meet the burden that would entitle it to a summary judgment. *See Latimer*, 919 F.3d at 303. The fact issues described above preclude summary judgment in the Bank's favor on McFadden's prescriptive claim under 26 U.S.C. § 2615(a)(1) of interference with her entitlements under the FMLA. The Court next addresses McFadden's proscriptive claim of retaliation.

## C.      Proscriptive Claim: Retaliation and Constructive Discharge

The essence of McFadden's proscriptive claim is that the Bank "forced" her to resign in retaliation for her taking leave under the FMLA. McFadden argues she suffered an adverse employment action because she was "constructively discharged" when she resigned rather than take the teller position at the Buckner location. The Bank maintains McFadden suffered no adverse employment action because it assigned her to a position with equal pay and benefits upon her return and she thereafter resigned voluntarily.

To establish a *prima facie* case of retaliation under the FMLA, McFadden must show that: (1) she was protected under the Act; (2) she suffered an adverse employment decision; and either that (3a) she was treated less favorably than an employee who had not requested leave under the Act; or (3b) the adverse decision was made because she took FMLA leave. *Hunt*, 277 F.3d at 768 There must be a causal link between the protected activity and the adverse employment decision. *Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 332–33 (5th Cir. 2005).

When there is no direct evidence of discriminatory intent, the court relies on either the traditional *McDonnell Douglas* framework or the mixed-motive framework in determining "whether an employer discharged an employee in retaliation for participating in the FMLA-protected activities." *Id.*; *Hunt*, 277 F.3d at 768. In either case, McFadden must first establish a *prima facie* case of retaliation. *Richardson*, 434 F.3d at 332. If she does so, then the burden reverts to the Bank to put forth a legitimate nondiscriminatory or nonretaliatory reason for the adverse employment action at issue. *Id.* Upon the Bank's articulation of a legitimate reason for making the employment decision, the burden shifts back to McFadden to present by a preponderance of the evidence, that: (a) the employer's articulated reason is a pretext for retaliation; or (b) the employer's reason, while true, "is but one of the reasons for its conduct, another of which was discrimination." *Id.* at 332-33. "If the employee proves discrimination was *a* motivating factor in the employment decision, the burden again shifts to the employer to prove it would have taken the same action despite the discriminatory animus." *Id.* at 333.

In its Motion, the Bank asserts that McFadden has failed to establish a *prima facie* case of retaliation because she has suffered no adverse employment decision. If this is the case, then McFadden has failed to meet her initial burden under the *McDonnell-Douglas* burden shifting framework. *See id.* at 333. Yet McFadden asserts her "forced resignation" is the adverse employment decision she suffered in retaliation for taking FMLA leave. The Bank argues that McFadden cannot satisfy the causal link necessary to establish a *prima facie* case of retaliation because the undisputed record evidence shows that McFadden voluntarily resigned her position. McFadden asserts that while she did voluntarily turn in a resignation notice, the Bank created circumstances that made her resignation *involuntary*, resulting in a constructive discharge.

"A constructive discharge occurs when the employer makes working conditions so intolerable that a reasonable employee would feel compelled to resign." *Hunt*, 277 F.3d at 771.  In examining a claim of constructive discharge, the court objectively considers "a variety of factors, including the following:

> (1) demotion;
>
> (2) reduction in salary;
>
> (3) reduction in job responsibilities;
>
> (4) reassignment to menial or degrading work;
>
> (5) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or
>
> (6) offers of early retirement that would make the employee worse off whether the offer was accepted or not.

*Id.* at 771–72 (citing *Barrow v. New Orleans S.S. Ass'n*, 10 F.3d 292, 297 (5th Cir. 1994)).  Further, the Fifth Circuit has held that "constructive discharge cannot be based upon the employee's subjective preference for one position over another.  *Id.* at 772 (citing *Jurgens v. EEOC*, 903 F.2d 386, 391 (5th Cir. 1990)).

The inquiry does not focus on whether the employee "felt compelled to resign, but whether a reasonable employee in her situation would have felt so compelled." *Id.*  The Fifth Circuit has looked to whether the employee attempted resolution of her concerns before choosing to resign in determining whether certain working conditions would have compelled a reasonable employee to resign.  *Haley v. Alliance Compressor Co.*, 391 F.3d 644, 652 (5th Cir. 2004).  In *Haley*, the circuit court affirmed summary judgment on a constructive discharge claim by an employee and noted "a reasonable employee who genuinely felt these working conditions were upsetting to the point of

intolerable would have attempted resolution of these concerns before choosing to quit after just over two weeks back on the job." *Id.*

Even a cursory examination of McFadden's assertions reveals that she has argued none of the factors which would support the finding of constructive discharge. *See Hunt*, 277 F.3d at 771–72. McFadden does not assert the transfer to a teller position was a demotion or reduction in job responsibilities. Her arguments focus on the job duties being different, not necessarily a reduction in responsibility, and that she personally preferred not to return to a job she had held several years prior. There is no assertion that McFadden's salary was reduced, or that she was assigned to "menial or degrading work." *See id.* at 771-72. McFadden does not assert that she was badgered, harassed or humiliated by the employer, or that she was offered early retirement that would leave her worse off. *See id.* Rather, it seems McFadden "had no interest" in being a teller at the Buckner branch, as she wrote in her resignation notice, and preferred not to work at the Buckner branch due to her own subjective preferences. *See id.* at 772. These reasons do not support a finding of constructive discharge. *See id.* She personally felt compelled to resign immediately, but the Court cannot find any evidence brought forth by McFadden to indicate that a *reasonable employee* in her situation would have felt so compelled. *See id.*

Furthermore, it is undisputed that McFadden made no effort to resolve the situation prior to resigning. She learned on August 6, 2007 that she would be restored to a teller position at the Buckner location, but had not yet confirmed what her work schedule would be or made her scheduling requests known to the teller supervisor at the Buckner branch. Without talking to anyone at the Bank regarding her concerns, McFadden resigned the very next day. If the new position was "so intolerable" as to compel resignation, the Court finds a reasonable employee would

have attempted to resolve the situation by talking to the Bank regarding her concerns, rather than simply resign one day after her return to work. *See Hunt*, 277 F.3d at 772; *Haley*, 391 F.3d at 652. Her failure to bring her concerns to the attention of the Bank prior to resigning is further evidence that McFadden's voluntary resignation was not a "constructive discharge." *See Haley*, 391 F.3d at 652.

Accordingly, the Court finds McFadden has failed to make a *prima facie* showing that her resignation was a constructive discharge and has thus failed to present a genuine issue of material fact on whether she suffered an adverse employment decision. *See Hunt*, 277 F.3d at 772; *Haley*, 391 F.3d at 652. McFadden has not met her burden to make a *prima facie* case of retaliation. *See Richardson*, 434 F.3d at 332–33. Therefore, the Court **GRANTS** summary judgment in favor of the Bank on McFadden's claim of retaliatory discharge under the section 2615(a)(2) of the FMLA.

## V. Conclusion

In conclusion, as to the summary judgment evidence submitted by McFadden, the Banks's **OBJECTIONS** (doc. 19) to the separate affidavit filed as document 17 and the Texas Workforce Commission documents filed as Exhibit 2 of McFadden's Appendix are **SUSTAINED**. The Motion to Strike Plaintiff's Summary Judgment Evidence (doc. 19) is **GRANTED**. The affidavit filed as document 17 is **STRICKEN**. This does not apply to the affidavit contained in the appendix itself. The Texas Workforce Commission Records contained in pages App. 048-092 of the Appendix to Plaintiff's Response to Defendant's Motion for Summary Judgment, consisting of the entirety of **Exhibit 2 to document 16**, are **STRICKEN**.

Furthermore, the Bank's Motion for Summary Judgment is **GRANTED in part, and DENIED in part**. The Bank's Motion is **DENIED** as to the interference claim and **GRANTED** as to the retaliation claim. Accordingly, McFadden's retaliation claim under 29 U.S.C. § 2615(a)(2) of the FMLA is **DISMISSED**.

**SO ORDERED.**

**SIGNED January 6, 2009**

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE